UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 3:03CR218(JBA) |
| v. | |
| OSAS AYEKI<br>(a.k.a. "Buck") | February 25, 2005 |

GOVERNMENT'S THIRD SUPPLEMENTAL SENTENCING MEMORANDUM

    The United States of America respectfully submits this Third Supplemental Sentencing Memorandum regarding defendant Osas Ayeki, who is scheduled to be sentenced on March 1, 2005, at 9:00 a.m. The purpose of this memorandum is to articulate the Government's position on the application of the Sentencing Guidelines in the wake of *United States v. Booker*, 125 S. Ct. 738 (2005). Additionally, this memorandum will explain why various factors do not warrant a variance from the advisory Guidelines range when deciding upon the appropriate sentence in light of the factors outlined in 18 U.S.C. § 3553(a). Finally, this memorandum will respond to certain arguments raised in the Defendant's Sentencing Memorandum dated February 23, 2005.

    This memorandum is intended to supplement the Government's previous sentencing memoranda dated February 6, 2004 (Court Document No. 40) and June 18, 2004 (Court Document No. 46). (The Government also filed two memoranda on July 16, 2004 (Court Document Nos. 51 and 52) in connection with certain legal and factual issues arising from the Supreme Court's decision in *Blakely v. Washington*). For the reasons set forth below and in its previous memoranda, the Government recommends a Guideline sentence of 60 months.

I.     PRELIMINARY STATEMENT

The Government incorporates by reference its memorandum dated June 18, 2004, which sets forth in detail the procedural history of this case and summarizes the offense conduct. The Government's June 18, 2004 memorandum also sets forth the Government's proposed Guidelines calculation. In sum, the Government concurs with the Probation Office's Guidelines calculation, which is set forth at paragraphs 52 through 64 of the Presentence Report ("PSR"), with the exception of the adjustment for acceptance of responsibility in paragraph 63. The Government agrees with the Probation Office's conclusion that the defendant is in Criminal History Category I (PSR, ¶ 67). The Government submits that the defendant's final offense level is Level 30, which corresponds to a sentencing range of 97 to 121 months. Because the offense of conviction carries a maximum statutory sentence of five years, the Court cannot impose a sentence greater than 60 months. In addition, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A.

At the sentencing hearing on June 24, 2004, the Government offered evidence to support its Guidelines calculation. The Government expects to offer additional evidence when the sentencing hearing is resumed on March 1, 2005.

II.     SENTENCING IN THE WAKE OF *BOOKER*

In *United States v. Booker*, 125 S. Ct. 738, 2005 WL 50108 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory

provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." *Booker*, 2005 WL 50108, at *16. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." *Id.* at *24.

The Court of Appeals for the Second Circuit has offered some initial guidance to sentencing courts on how to proceed with sentencings in the wake of *Booker*. In *United States v. Crosby*, No. 03-1675 (2d Cir. Feb. 2, 2005), the Court summarized the impact of *Booker* as follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). ***Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range,*** or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. ***Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence.*** Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

Slip op. at 24-25 (emphasis added).

In other words, a sentencing now involves two analytic stages: first, a determination of the applicable Guideline range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the same manner as before *Booker/Fanfan*." *Id.* at 20; *see id.* at 19. In limited circumstances,

"precise calculation of the applicable Guidelines range may not be necessary" when a judge determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines sentence, regardless of which of the two ranges applies." *Id.* at 21. Such may be true in cases involving "complicated matters, for example, determination of monetary loss," or "close questions . . . as to the precise meaning or application of a policy statement authorizing a departure." *Id.* In general, however, Stage One requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in Stage One. These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant;" (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;" (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play a central role in a sentencing court's § 3553(a) calculus. Writing for the remedial majority in *Booker*, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." 2005 WL 50108 at *27. As the Court of Appeals has pointed out, "the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." *Crosby*, slip op. at 18.

> [I] is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

*Id.* at 25.

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in *Booker* recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. *See, e.g., Booker*,

2005 WL 50108 at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); *id.* at *19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); *id.* at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); *id.* at *47 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity."). *See also United States v. Wanning*, No. 4:03-CR-3001-1, slip op. at 6 (D. Neb. Feb. 3, 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission at the direction of Congress to implement the statutory purposes of sentencing.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of 15 years of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress. The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), not least of which are the nature and circumstances of the offense (which are covered thoroughly in Chapters 2 and 3 of the Guidelines Manual), the history and characteristics of the defendant (which are covered in Chapter 4 with respect to criminal history and Chapter 5 with respect to departures based on the most commonly considered personal characteristics), and the need to provide restitution to victims (Chapter 5, Part E).

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing outlined in § 3553(a), and should occur absent truly unusual circumstances. *See Wanning*, slip op. at 8-9 (concluding that "judges should, in the exercise of their newly minted discretion, normally follow the Guidelines, and the ranges produced by them, because that approach represents the best (though an imperfect) method of sentencing"). The Government commends to the Court's attention the scholarly opinions of Judge Cassell in *United States v. Wilson*, 2005 WL 78552 (D. Utah Jan. 13, 2005) ("*Wilson I*"), and No. 2:03-CR-00882 PGC (D. Utah Feb. 2, 2005) ("*Wilson II*"), available at http://www.utd.uscourts.gov/reports/wilson2.pdf, which reach this same conclusion. As Judge Cassell explained, the Guidelines represent the product of an expert commission which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to accord with legislatively determined policies. *Wilson* further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. Judge Cassell further observed that the Guidelines provide appropriate guidance, which is fully consonant with legislative policy, as to when particular offender characteristics properly factor into the sentencing calculus -- for example, forbidding consideration of factors such as race, religion, or socioeconomic status, and assigning only modest weight to factors such as family ties, age, and civic contributions. *Wilson II*, slip op. at 17. Importantly, Judge Cassell properly concluded that one of the primary goals of the criminal

sentencing system is "equal justice under the law -- with a sentencing statute that mandates similar outcomes for similar crimes committed by similar offenders." *Id.* at 31. "The only realistic way to insure this is to follow generally the Guidelines." *Id.* For all of these reasons, a court should "give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." *Wilson I*, at *1.

Accordingly, a sentence within the guideline range is presumptively reasonable, and accommodates the congressional purpose set forth in § 3553(a), affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible. The Government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate, absent truly extraordinary circumstances.

As explained below, this case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a). Therefore, the Government respectfully recommends that the Court sentence the defendant within the Guidelines range calculated in the PSR.

III.     THERE IS NO REASON TO IMPOSE A SENTENCE OUTSIDE THE GUIDELINES

In his sentencing memorandum, the defendant argued in favor of a sentence more lenient than the Guidelines sentence as calculated in the PSR. The defendant invoked the factors listed under 18 U.S.C. § 3553(a), which would supposedly make such leniency more "reasonable" than a sentence within the advisory Guidelines range. As discussed below, none of these factors justifies a deviation from the advisory range.

      A.      The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant.

Section 3553(a)(1) requires the Court to consider the nature and circumstances of the offense and the history and characteristics of the defendant. The PSR and the evidence in this case will present the Court with significant information relevant to this factor. Most of this information reflects very badly on the defendant. Although the defendant has no prior criminal convictions, the evidence has shown that even before his participation in the conspiracy of which he stands convicted, he was engaging in other credit card fraud schemes. Furthermore, the Government will present additional evidence showing that in the spring and early summer of 2003, after the conclusion of the offense of conviction, he was an organizer or leader in yet another large-scale financial fraud scheme. Through his various schemes, the defendant and his co-conspirators victimized numerous financial institutions in several states, resulting in hundreds of thousands of dollars in losses. Moreover, the defendant's criminal activities compromised the personal privacy and financial security of hundreds of unsuspecting credit card holders whose identities were stolen by the defendant and his co-conspirators. Notwithstanding the fact that he engaged in serious criminal activity before and after the offense of conviction, he is still in Criminal History Category I, which, if anything, appears to understate his true criminal history. In light of this, there can be no serious argument that the fact that the defendant has no prior record somehow weighs in favor of leniency.

Since his arrest in this case, the defendant has expressed no remorse or contrition for his participation in these criminal activities. Instead, he has falsely minimized his role in the offense of conviction. The evidence, including consensual recordings of the defendant, reveals him to be

a cunning and sophisticated criminal who has used his abilities to steal other people's money rather than to earn it by his own honest effort.

In support of his request for leniency, the defendant has noted certain circumstances that would affect his family. First, he claims that he is facing the almost certain prospect of deportation. While it is true that the defendant *may* be deported as a result of his criminal conviction in this case, the outcome of any deportation proceedings is far from certain and the Court should not impose a sentence based on the possibility of deportation. The defendant also mentions his role as a husband and father. In this regard, he is no different from numerous other defendants who appear before the Court for sentencing. What is different from many other defendants, however, is that the defendant's wife was well aware of his criminal activity, if not actively involved in it herself. It is worth noting that the Government could have, but did not, pursue a criminal investigation of the defendant's wife based on information provided by Audley Stewart and others.

  B. <u>The Need to Reflect the Seriousness of the Offense.</u>

Section 3553(a)(2)(A) requires the Court to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment. None of these factors weighs in favor of leniency and they cannot be used to justify an non-Guidelines sentence. Indeed, the seriousness of the offense itself weighs heavily in favor of a Guidelines sentence. It is worth noting in this regard that the defendant's Guidelines range is significantly higher than the statutory maximum for the offense charged and it is unlikely that he

will be prosecuted in any other jurisdiction for his criminal conduct.[1]  Accordingly, this Court's sentence will most likely be the only punishment the defendant will receive for his extensive criminal activity in the District of Connecticut and elsewhere.

      C.      The Need to Afford Adequate Deterrence and to Protect the Public From Further Crimes of the Defendant.

Sections 3553(a)(2)(B) and (C) require the Court to consider the need for the sentence to promote both general and specific deterrence.  A Guidelines sentence would accomplish both of these goals.  Credit card fraud is a widespread and fast-growing problem in the United States.  It is extremely easy to commit and extremely difficult to detect.  The evidence in this case will show that it was only through fortuity and intensive investigative measures undertaken by the Postal Inspection Service and the United States Attorney's Office that led to the convictions of Abiodun Olagundoye, Audley Stewart, and the defendant.  There is every reason to believe that a severe sentence in this case will deter others from engaging in this kind of criminal activity.  A non-Guidelines sentence would diminish the goal of general deterrence.  In light of the substantial sums that can be obtained through credit card fraud, a person considering engaging in or continuing to engage in this type of crime might well conclude that risking a prison sentence of two or three years is well worth the prospect of receiving hundreds of thousands of dollars in ill-gotten gains.

---

[1] Although a criminal complaint against the defendant was filed in the United States District Court for the Eastern District of New York in August 2003, the United States Attorney's Office in that district is not actively pursuing a criminal prosecution at this time.  If this Court imposes the maximum sentence of 60 months, it is virtually certain that the defendant will not be prosecuted in the Eastern District of New York.

As to specific deterrence, there is no reason to believe that the defendant, upon his release, will abandon his criminal activities and seek legitimate employment. The PSR reflects that he has no career to fall back on. *See* PSR at ¶¶ 76-79. Given the ease with which credit card fraud can be committed and the difficulty for law enforcement of detecting and prosecuting such frauds, the Government has no confidence that the defendant would abandon his lucrative criminal career once he is released from custody.

D. The Need to Rehabilitate the Defendant.

Section 3553(a)(2)(D) requires the Court to consider the need for the sentence to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. The Government submits that the defendant's rehabilitation can be accomplished most effectively by a Guidelines sentence, which may afford the defendant with opportunities for educational and vocational training that would equip him for a career other than crime. A non-Guidelines sentence would be less likely to provide the defendant with the time and incentive to take advantage of the educational and vocational opportunities available to him in the Bureau of Prisons.

E. The Sentencing Guidelines.

Section 3553(a)(4)(A) requires the Court to consider the Sentencing Guidelines. This factor has been addressed in the Government's June 18, 2004 sentencing memorandum. The Government has presented evidence and intends to present additional evidence supporting the contested Guidelines adjustments.

F.     The Need to Avoid Unwarranted Sentence Disparities.

Section 3553(a)(6) requires the Court to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. This is precisely the reason for applying a Guidelines sentence and cannot be a basis for imposing a sentence below the applicable Guidelines range.

The defendant correctly notes that two of his co-conspirators who pled guilty in this Court received sentences much lower than the time already served by the defendant. While this is true, it is also highly misleading. Both Abiodun Olagundoye and Audley Stewart immediately admitted their participation in the conspiracy upon being confronted by law enforcement officers. Both men promptly pled guilty, agreed to cooperate with the ongoing investigation and, in fact, provided substantial assistance to the Government. The defendant, in contrast, admitted nothing when confronted by law enforcement officers and pled guilty days before trial and only after the Government had expended substantial resources in preparing for trial and selecting a jury. Even after pleading guilty to the indictment, the defendant would admit to only the barest elements of the offense, rather than the full extent of his criminal conduct as set forth in the indictment. The Government afforded the defendant several opportunities to cooperate in its ongoing investigation, with the prospect of a sentence reduction if he were to provide substantial assistance. The defendant did not avail himself of these opportunities. The relatively light sentences imposed by this Court on Olagundoye and Stewart reflect not only their relative culpability, which was less than that of the defendant, but also the fact that they promptly admitted their crimes and timely provided highly valuable information to the Government.

IV.   CONCLUSION

The Government respectfully recommends that the Court impose a sentence of incarceration of 60 months, which is the maximum sentence allowed by statute and is considerably lower than the Guidelines range calculated in the PSR (70 to 87 months) or by the Government (97 to 121 months). Such a sentence would recognize the seriousness of defendant's offense conduct and his leadership role in a large and lucrative credit card fraud scheme with hundreds of victims. The defendant carefully engaged in a pattern of criminal conduct, through which he defrauded banks, credit card companies, and unsuspecting individuals of hundreds of thousands of dollars, and which was finally unraveled, if only partially, after a significant investment of time and effort by law enforcement agencies in three different states. There are no mitigating circumstances that would diminish his criminal culpability and no reasons why the defendant should not receive the maximum sentence allowed by law, which, in any event, is significantly less than the applicable Guidelines sentence.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


JOHN A. MARRELLA
ASSISTANT U.S. ATTORNEY
Federal Bar No. CT19473
157 Church Street, 23d Floor
New Haven, CT 06510
(203) 821-3700

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been sent by fax and U.S. Mail, postage prepaid, this __th day of February, 2005, to:

William Bloss, Esquire
Koskoff, Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
(203) 368-3244

and by hand delivery to:

Mr. Christopher Rogers
United States District Court
Probation Office
157 Church Street, 22nd Floor
New Haven, CT 06510

_____
JOHN MARRELLA
ASSISTANT UNITED STATES ATTORNEY